IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JESSICA WEBB, | ) | CASE NO. 1:19-cv-00123 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jessica Webb ("Plaintiff" or "Webb") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

On January 17, 2016, Webb protectively filed applications for DIB and SSI.[1]  Tr. 17, 159, 160, 257-264.  Webb alleged a disability onset date of February 28, 2015 (Tr. 17, 259),

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 10/21/2019).

based on severe anxiety, alcoholism/addict, panic attacks, fear of public/isolation, shaking most of the day and night, insomnia, fear of phone ringing, depression, rapid speech, stuttering, and mind blanking out (Tr. 82, 202, 211). After initial denial by the state agency (Tr. 201-208) and denial upon reconsideration (Tr. 211-215),[2] Webb requested a hearing (Tr. 219-220). On December 8, 2017, a hearing was held before an Administrative Law Judge ("ALJ"). Tr. 37-79.

On April 9, 2018, the ALJ issued an unfavorable decision (Tr. 14-36), finding that Webb had not been under a disability within the meaning of the Social Security Act from February 28, 2015, through the date of the decision (Tr. 18, 30). Webb requested review of the ALJ's decision by the Appeals Council. Tr. 254-256, 362-363. On November 13, 2018, the Appeals Council denied Webb's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-8.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Webb was born in 1982. Tr. 29. She was 33 years old on her alleged onset date. Tr. 29. At the time of the hearing, she was living with her fiancé and her 12-year-old daughter. Tr. 48. Webb also had a minor son who lived with his father. Tr. 48. Webb graduated from high school. Tr. 51. She last worked part-time in 2015 at Applebee's as a waitress. Tr. 51. In 2015, she also worked in a seasonal position at United Parcel Service (UPS). Tr. 51. The position at UPS did not work out well - she fell over her own feet and split her head open. Tr. 51-52. Her other past work included work at Harmony Home Care in 2009 and at Sign Express in 2002. Tr. 52. At Harmony Home Care, Webb worked as an STNA. Tr. 52. She worked in a client's home

---

[2] As discussed below, the Disability Determination Services (DDS) originally indicated that the claim should be allowed. However, following a Quality Control Review, the claim was denied initially and on reconsideration. Tr. 42, 96-97, 201-208, 211-215.

and would be at the home and sit with the client and help the client as needed.  Tr. 53.  Sign Express was a company that her mom owned.  Tr. 53.  Webb helped her grandfather install signs. Tr. 53.

**B.    Medical evidence**

**1.  Treatment history**

On July 31, 2015, Webb was admitted to the hospital for alcohol intoxication and thrombocytopenia after having fallen at home.  Tr. 378-441.  Webb relayed that she had a history of excessive alcohol use but had abstained for the past year until her mother was recently diagnosed with a brain tumor.  Tr. 387.  Webb reported she had started drinking again in the prior four months and had been drinking heavily over the past couple weeks.  Tr. 432.  She was treated for withdrawal symptoms and thrombocytopenia and she was discharged on August 11, 2015.  Tr. 430, 432, 433.  Webb was discharged with instructions to discontinue use of alcohol and seek treatment through an outpatient chemical dependency and rehabilitation program or through Alcoholics Anonymous (AA).  Tr. 433.

Webb saw Brittany Kelly, Ph.D., at Psychological & Behavioral Consultants, on January 14, 2016, for an initial clinical assessment.  Tr. 481-484.  Dr. Kelly's clinical assessment from that visit is dated January 18, 2016.[3]  Tr. 484.  Webb relayed that she had used alcohol to cope with anxiety and sleep.  Tr. 481.  She explained that she was upset about how she had to be hospitalized the prior year due to her alcohol use and the impact it had on her family.  Tr. 481. Webb reported that she had to learn how to walk again after having been hospitalized the prior summer.  Tr. 481.  Webb was seeking counseling due to her ongoing struggle with depression and anxiety.  Tr. 481.  She was having a difficult time coping with her mother's death.  Tr. 481,

---

[3] Dr. Kelly also completed a Daily Activities Questionnaire which is discussed below in the opinion evidence section.  *See* Tr. 478-480.

482.  Webb explained that crowds caused her more stress and anxiety.  Tr. 481.  Dr. Kelly observed that Webb was cooperative, fidgety, friendly; she had an anxious mood and affect, her memory was good; her insight and judgment were fair; and her intelligence was estimated to be above average.  Tr. 482.  Webb indicated she had a limited support system but used resources that were available to her, including AA and her sponsor, to help her maintain her sobriety.  Tr. 482.  Dr. Kelly diagnosed Webb with generalized anxiety disorder.  Tr. 484.

On March 15, 2016, Webb saw Dr. Kelly for a psychotherapy session.  Tr. 525-526. Webb discussed her continued anxiety and her inability to go out in public because being around people made her feel nervous and often led to panic attacks.  Tr. 525.  Webb indicated she was frustrated with there being something wrong with her and she felt that she was not receiving any support from her family regarding her mental health concerns.  Tr. 525.  Webb discussed strategies she used to help with her panic attacks when she does have to be around other people. Tr. 525.  Dr. Kelly noted that Webb had been through a lot of trauma when she was a child and had never fully addressed her emotions.  Tr. 525.  Dr. Kelly also noted that Webb's physical shaking symptoms seemed to be related to Webb's "absorption of years of trauma and anxiety in which she never dealt with."  Tr. 525.  Dr. Kelly diagnosed generalized anxiety disorder and post-traumatic stress disorder, chronic.  Tr. 526.

On March 31, 2016, Webb saw Sarah Mobley at Valley View Psychiatry for a psychiatric evaluation.  Tr. 491-496, 498-499.  Webb reported that she had been struggling with anxiety/panic; she had a history of substance abuse; and she had racing thoughts.  Tr. 491. Webb's anxiety was triggered by negative interactions and crowds.  Tr. 491.  After an anxiety attack, Webb indicated that she felt extremely sleepy.  Tr. 491.  During the evaluation, Ms. Mobley observed that Webb was short of breath, she appeared anxious, she was talkative and

restless.  Tr. 491.  Webb was attending AA meetings.  Tr. 492.  Ms. Mobley diagnosed panic

disorder, major depressive disorder recurrent episode, and alcohol use disorder moderate in

sustained remission.  Tr. 494.  Ms. Mobley continued Webb on Celexa and started her on

Vistaril.  Tr. 493.  Ms. Mobley recommended continued counseling.  Tr. 493.

Webb saw Dr. Kelly on April 19, 2016, for a psychotherapy session.  Tr. 517-518.  Dr.

Kelly observed that Webb was very anxious and fidgety.  Tr. 517.  She was bouncing her leg and

talking very fast.  Tr. 517.  Webb shared her concerns regarding her family not accepting her

mental health concerns and treating her poorly because she was unable to do things that she used

to be able to do.  Tr. 517.  Dr. Kelly continued to diagnose Webb with generalized anxiety

disorder and post-traumatic stress disorder, chronic.  Tr. 518.  Webb did not show for a

counseling session at Valley View Psychiatry on May 3, 2016.  Tr. 497.

On June 27, 2016, Webb saw Edward Craft, D.O., for a check-up to discuss her anxiety.

Tr. 546-549.  Webb explained that she had been approved for social security disability but

Quality Control reviewed her case and she was no longer on disability and needed to file an

appeal.  Tr. 546.  Webb was interested in attaching new reports from other doctors.  Tr. 546.  Dr.

Craft observed that Webb's judgment and insight were intact; she was alert and oriented; her

mood and affect were anxious; she was not stuttering; she spoke quickly but was easy to

understand; and her eye contact was off and on.  Tr. 548.  Dr. Craft diagnosed depression and

anxiety.  Tr. 548.  Dr. Craft noted that Webb had accused him of not helping her and not writing

down her symptoms.  Tr. 549.  Dr. Craft showed Webb what he had submitted back in February.

Tr. 549.  Webb became very worked up and Dr. Craft, with permission, helped calm Webb down

with prayer.  Tr. 549.  Dr. Craft relayed that he had documented Webb's symptoms but indicated

to her that she needed a more accurate diagnosis from psychiatry and recommended further

psychiatric evaluation, noting concern regarding agoraphobia versus malingering or other personality disorder.  Tr. 549.  Dr. Craft, nevertheless, indicated, "if this is the [patient's] normal I would not recommend her working as she should be placed in tense [inpatient] or [outpatient] treatment." T r. 549.

Webb saw Dr. Kelly on June 28, 2016.  Tr. 527-528.  Webb appeared at the visit shaking uncontrollably and having a hard time not stuttering her words.  Tr. 527.  Webb reported that her anxiety was getting worse.  Tr. 527.  Webb was tearful about the fact that she fell down when she was very nervous and was unable to control her muscles.  Tr. 527.  Dr. Kelly indicated that Webb appeared to be dealing with intense anxiety that might be manifesting itself as pseudo-seizures or some type of somatoform disorder.  Tr. 527.  Dr. Kelly diagnosed generalized anxiety disorder; post-traumatic stress disorder, chronic; and agoraphobia with panic disorder.  Tr. 528.

Webb attended a follow-up session at Valley View Psychiatry on July 20, 2016.  Tr. 505-506.  Webb reported that she continued to feel anxious and had been since becoming sober in November 2015.  Tr. 506.  She complained of panic attacks, nightmares, an anxious affect and mood.  Tr. 506.  Webb had been unable to concentrate.  Tr. 506.  She was interested in medication that could provide her with immediate relief for her anxiety.  Tr. 506.  Webb's medications were adjusted.  Tr. 506-507.  Webb reported that she was given SSI disability due to her panic attacks but she was awaiting final word.  Tr. 506.

Webb was seen at Valley View Psychiatry on August 1, 2016.  Tr. 722-724.  Webb's session was with Brankica Podravac MSN, RN, PMHNP-BC.  Tr. 722.  Nurse Practitioner Cassie Skul was also present.  Tr. 722.  Webb admitted that she had not been completely forthright during her last visit regarding the medications she was taking.  Tr. 722.  She had informed Nurse Prodravac that she had been taking Celexa as prescribed but she had not been.

Tr. 722.  She was now only taking Prozac but was not taking that medication as prescribed – she had increased the dosage.  Tr. 722.  Webb stated she was not taking Atarax because she did not feel that it was helping but had taken Atarax before coming to her appointment.  Tr. 722-723.  Webb had tapered off of Wellbutrin and was no longer taking Celexa.  Tr. 723.  Webb was still having panic attacks but they were occurring less frequently than previously.  Tr. 723.  Both nurses cautioned Webb about changing doses of her medication on her own.  Tr. 723.  Webb felt that maybe the Wellbutrin was making her jittery.  Tr. 723.  Webb reported that she had been sleeping peacefully and without twitching or jerking.  Tr. 723.  Webb indicated her appreciation for the care and felt that her nurse had done a good job prescribing her medication.  Tr. 723.  Nurse Podravac continued Webb on Prozac because it was helping with her anxiety symptoms and sleep.  Tr. 723.  Nurse Podravac continued Atarax as needed and advised Webb to follow up with Nurse Skul in two weeks.  Tr. 723.

Webb saw Dr. Kelly on August 4, 2016.  Tr. 686-687.  Dr. Kelly noted that Webb was slightly less anxious than during her previous session.  Tr. 687.  Webb relayed that changes in her medication had improved her anxiety a little.  Tr. 687.  Webb continued to report being anxious regarding relationships with her family members and she expressed sadness over the loss of her mother.  Tr. 687.  Dr. Kelly continued to diagnose generalized anxiety disorder; post-traumatic stress disorder, chronic; and agoraphobia with panic disorder.  Tr. 687.

On October 8, 2016, Webb sought urgent care treatment for left-ankle pain.  Tr. 553-555.  She had rolled her ankle while putting up Halloween decorations.  Tr. 553.  Webb was able to ambulate but had pain.  Tr. 553.  There was no bruising or redness.  Tr. 553.  Webb's physical examination was consistent with a mild sprain.  Tr. 553.  She was provided with an air cast for stabilization.  Tr. 554.

On October 12, 2016, Webb was seen at North Ohio Heart for complaints of dizzy spells. Tr. 618-619.  Vertigo was listed under Assessment and a neurology consult was requested.  Tr. 619, 620.

Webb saw Dr. Kelly on October 25, 2016.  Tr. 688-690.  Webb explained that she was still struggling with severe anxiety and not being able to have control of her body reactions.  Tr. 689.  She reported that she was shaking all the time and had frequent vertigo.  Tr. 689.  She reported concerns about frequent headaches, double vision and constant dizziness.  Tr. 689.  Dr. Kelly observed that Webb had appropriate eye contact; she was well groomed; she was attentive and calm; her tone was adequate; her affect and mood were anxious; her thought process was circumstantial and she had depressive thoughts; her memory was good; her intelligence was estimated to be average; her insight was fair; and her judgment was poor.  Tr. 688.  Dr. Kelly continued to diagnose generalized anxiety disorder; post-traumatic stress disorder, chronic; and agoraphobia with panic disorder.  Tr. 689.

On November 2, 2016, Webb saw Tanvir Syed, M.D., with University Hospital's neurology department regarding vertigo.  Tr. 632-634, 682-685.  Dr. Syed ordered a brain MRI and ambulatory EEG testing.  Tr. 634, 684.  Webb had ambulatory EEG testing performed on November 4, 2016 – November 11, 2016.  Tr. 635, 636-646, 648-652, 654-658.

Webb saw Dr. Kelly on November 11, 2016.  Tr. 691-693.  Dr. Kelly observed that Webb had appropriate eye contact; she was attentive but fidgety-shaky; she was talking fast; her affect and mood were anxious; her thought process was circumstantial with ideas of reference; her memory was good; her insight was fair; and her judgment was good.  Tr. 691.  Webb shared with Dr. Kelly that she had seen a neurologist regarding her shakiness and vertigo.  Tr. 692.  Webb relayed that she was anxious about going to court with her ex regarding custody, noting she was

8

nervous about the negative things that he might say about her.  Tr. 692.  Webb discussed triggers for her anxiety and how she had a hard time leaving her home.  Tr. 692.  Dr. Kelly continued to diagnose generalized anxiety disorder; post-traumatic stress disorder, chronic; and agoraphobia with panic disorder.  Tr. 692.

On November 29, 2016, Webb saw Jesse E. Templeton, M.D., at Orthopaedic Associates, Inc., for right hand pain after she had fallen down 5 steps three days earlier when her legs gave out on her.  Tr. 557-559.  X-rays showed a long oblique fracture of the right third metacarpal shaft without articular involvement.  Tr. 558. Dr. Templeton recommended a cast.  Tr. 559. Webb saw Dr. Templeton for follow up on December 9, 2016.  Tr. 560-562.  Webb requested removal of the cast because of some rubbing against her forearm.  Tr. 560.  X-rays showed good alignment.  Tr. 561.  Although Dr. Templeton did not feel that the existing cast was compromised, per Webb's request, Dr. Templeton changed her cast and recommended follow up in one week.  Tr. 561.  On December 12, 2016, Webb returned to Orthopaedic Associates, Inc. with complaints that her cast was causing a blister.  Tr. 563.  Webb's cast was removed and replaced with a new short arm radial cast.  Tr. 563.  Webb followed up with Dr. Templeton on December 16, 2016.  Tr. 564-566.  Dr. Templeton noted that Webb's alignment was within acceptable parameters and there was evidence of early healing so Dr. Templeton transitioned Webb to a removable brace that Webb was directed to wear at all times during the day.  Tr. 566. Dr. Templeton recommended occupational therapy but Webb was not interested.  Tr. 566.  They discussed range of motion exercises for home.  Tr. 566.

Webb had a follow-up visit with Dr. Syed on December 1, 2016, after having had an MRI and EEG testing.  Tr. 600-603.  Webb relayed that she was continuing to have "usual seizures." Tr. 600.  Dr. Syed observed that Webb's attention, concentration and memory were intact.  Tr.

600.  Dr. Syed indicated that the brain MRI scan was normal.  Tr. 601.  The EEG testing did not

demonstrate evidence of active epilepsy.  Tr. 635.  Dr. Syed believed that Webb's diagnosis was

conversion disorder based on the EEG testing.  Tr. 601.

On December 23, 2016, Webb saw Dr. Syed and reported that her issues were becoming

more severe.  Tr. 676-678.  Dr. Syed referred Webb to Dr. Camilla Kilbane, M.D.  Tr. 678.

During a follow-up session with Dr. Kelly on January 24, 2017, Webb discussed her

recent doctor appointments relating to her chronic shaking and explained that she had fallen

several times and broken her wrist.  Tr. 694-696.  Webb expressed concern that she could have

Parkinson's disease and indicated she could no longer see clearly and had to wear glasses.  Tr.

695.  Dr. Kelly indicated that it appeared that Webb was deteriorating with her ability to walk,

not shake, and her vision.  Tr. 695.  Dr. Kelly provided Webb with cognitive behavioral

techniques to help her address her stress levels until she was able to get more information

regarding what was wrong with her.  Tr. 695.  Dr. Kelly continued to diagnose generalized

anxiety disorder; post-traumatic stress disorder, chronic; and agoraphobia with panic disorder.

Tr. 696.

Webb saw Dr. Syed on February 22, 2017, indicating that she had seen her primary care

physician and requested a second opinion from Dr. Kilbane.  Tr. 588-591.  Dr. Syed noted that

he had previously referred Webb to Dr. Kilbane who had evaluated Webb and concluded that

Webb's symptoms were functional and consistent with somatoform disorder.  Tr. 588.  Webb did

not believe that Dr. Syed's or Dr. Kilbane's diagnosis was correct and she indicated she wanted

another opinion.  Tr. 588.  Webb showed Dr. Syed a list of 40-50 additional symptoms and asked

him whether the diagnosis would change based on those symptoms.  Tr. 588.  Dr. Syed observed

that Webb's attention, concentration and memory were intact.  Tr. 588.  Dr. Syed observed a

diffuse high-frequency tremor in Webb's extremities.  Tr. 589.  Dr. Syed explained to Webb that signs of somatoform disorder include multiple, unexplained symptoms so her list of symptoms "in a sense confirms the diagnosis."  Tr. 589.  Webb insisted on obtaining another opinion because she did not believe that her symptoms were psychogenic but she did mention she might have an essential tremor, exacerbated by anxiety.  Tr. 589.  Webb believed that she had Parkinson's disease.  Tr. 589.  Webb did not want to proceed with Dr. Syed's treatment plan.  Tr. 589.  Dr. Syed referred Webb to another movement disorder specialist.  Tr. 589.  Dr. Syed noted that Webb relayed that she had seen another doctor, Dr. Natalie Thomas, who thought that Webb's symptoms were somatoform.  Tr. 589.  Webb then proceeded to inform Dr. Syed that she had purposefully exaggerated her symptoms to convince Dr. Thomas that her symptoms were not somatoform.  Tr. 589.

During a March 23, 2017, session with Dr. Kelly, Webb was a little calmer, less anxious, had less shakiness, and noted improvement in relationships with her kids.  Tr. 698.  Dr. Kelly observed that Webb was cooperative; her affect was appropriate to content; and her mood was congruent with her affect.  Tr. 698.  Webb had circumstantial thoughts but normal thought process.  Tr. 698.  Webb's memory was good; her intelligence was estimated average; and her insight and judgment were fair.  Tr. 698.  Webb relayed that her family doctor had recently prescribed Abilify and Webb realized her shakiness had stopped.  Tr. 699.  She was focusing on spending more time with her kids and trying to work on her relationship with them.  Tr. 699.  Webb was continuing to struggle with being fearful of her ex.  Tr. 699.

Webb saw Dr. Syed on March 29, 2017, after having seen Dr. Gunzler, a movement disorder specialist, for a third opinion.  Tr. 584-587.  Dr. Gunzler agreed with Dr. Syed's diagnosis.  Tr. 584.  Dr. Syed believed that, while Webb was hesitant to do so, she was ready to

11

believe that she had conversion disorder.  Tr. 584.  An exercise regimen was recommended with follow up in 6-8 weeks.  Tr. 584, 587.

At an April 11, 2017, visit with Dr. Kelly, Webb was very upset regarding a recent child services investigation.  Tr. 701-703.  Webb relayed that her shakiness had improved but she had a few days when she was not taking her medication and she had fallen down the stairs.  Tr. 702.  Dr. Kelly observed that Webb exhibited hopelessness, low self-esteem and had a lot of fearful thinking.  Tr. 701.  Dr. Kelly noted that Webb's insight was fair but her judgment was grossly impaired.  Tr. 701.  Webb was attentive and cooperative and her memory was good.  Tr. 701.  Her affect was appropriate to content and her mood was congruent with affect.  Tr. 701.  Dr. Kelly continued to diagnose generalized anxiety disorder; post-traumatic stress disorder, chronic; and agoraphobia with panic disorder and added conversion disorder with motor symptoms or deficit as an additional diagnosis.  Tr. 702.

When Webb saw Dr. Kelly on June 26, 2017, she discussed how she had been feeling better and more calm.  Tr. 704-706. She indicated she had met with her doctor because she had gained weight since starting Abilify.  Tr. 705.  She was upset that she was unable to go places due to her anxiety.  Tr. 705.  Webb discussed that her kids were excited about spending more time wit her.  Tr. 705.  Webb continued to report being shaky and she was falling all the time.  Tr. 705.  Dr. Kelly continued to diagnose generalized anxiety disorder; post-traumatic stress disorder, chronic; agoraphobia with panic disorder; and conversion disorder with motor symptoms or deficit.  Tr. 706.

Webb saw Nurse Skul in July 2017 (Tr. 728, 731-732) and October 2017 (Tr. 725-727).  During an October 11, 2017, appointment for medication management, Webb reported that she felt that the addition Adderall had helped with her constant fatigue.  Tr. 726.  Webb had more

energy, motivation, and improved concentration. Tr. 726. And her anxiety had even decreased. Tr. 726. Webb had very little nervous shaking and it was intermittent in nature. Tr. 726. Webb's medications included Adderall, Prozac and Lamictal. Tr. 726. Nurse Skul recommended that Webb continue all medications and follow up in one month. Tr. 726.

### 2. Opinion evidence

*Treating sources*

### *Dr. Kelly*

On March 5, 2016, Dr. Kelly submitted a Daily Activities Questionnaire. Tr. 477-480. Dr. Kelly reported that she had only seen Webb for an initial assessment in January. Tr. 480. Dr. Kelly indicated that Webb's diagnosis was anxiety/low stress tolerance – ongoing. Tr. 480. Dr. Kelly indicated that cognitive behavioral therapy was used to treat Webb's impairments but she noted that the medications were "unknown." Tr. 480. Dr. Kelly stated that Webb's ability to remember, understand and follow directions was good, short-term, with assistance. Tr. 480. Dr. Kelly indicated that Webb had a poor ability to maintain attention and a poor ability to sustain concentration, persist at tasks and complete them in a timely manner. Tr. 480. When asked to describe any deficiencies in Webb's social interaction, Dr. Kelly stated "unknown," and when asked to describe any deficiencies in Webb's adaptation ability, Dr. Kelly stated "cannot predict." Tr. 480. When asked how Webb would react to pressures, in a work setting or elsewhere, involved in simple and routine, or repetitive tasks, Dr. Kelly stated "panic attacks – high anxiety." Tr. 480. When asked what might prevent Webb from performing work activities for a usual work day or work week, Dr. Kelly listed poor concentration, panic attacks, and low stress tolerance. Tr. 479.

### *Dr. Craft*

On February 17, 2016, Dr. Craft completed a medical report (Tr. 486-488), reflecting that he had first seen Webb on October 26, 2015, and last seen her on December 7, 2015 (Tr. 487). Dr. Craft listed diagnoses of macrocytic anemia, pancreatitis, and anxiety.  Tr. 487.  He described Webb's symptoms and medical condition, stating that Webb had anxiety and had complained of some fears and that Webb was an on and off addict.  Tr. 487.  Dr. Craft indicated that he believed a lot of Webb's symptoms and issues were "related to the addicts cycle [and] the cycle of her significant other [and] family members compounding the issues."  Tr. 487.  Dr. Craft noted that he had only seen Webb for two months.  Tr. 487.  During that time, he observed Webb appearing anxious during visits in October and November 2015 and being shaky during visits in November and December 2015.  Tr. 487.  Dr. Craft indicated he had referred Webb for a psychiatric appointment but was not sure whether Webb had attended it.  Tr. 487.  In addition to opining that Web would need close follow up with psych, Dr. Craft indicated that Webb might also need further rehab involvement.  Tr. 487.  Dr. Craft stated that Webb was only on two anxiety medications but she had needed to increase her dose.  Tr. 488.  Webb had been on antipsychotic medications but Dr. Craft noted that Webb had not followed up with psych for a refill.  Tr. 488.  Dr. Craft stated that he was not currently aware of any physical or personal limitations that her impairments would have on her ability to perform sustained work activity, stating further, "In fact, I believe the [patient] would benefit from social interactions at work [and] would lessen her chance of being at home to 'feel' lonely [and] put her at risk to relapse as an addict."  Tr. 488.

During a June 27, 2016, office visit, Dr. Craft indicated that, if the behavior Webb exhibited in his office that day was her normal, he would not recommend her working as she should be placed in an intense inpatient or outpatient program.  Tr. 549.

### *Nurse Skul*

On November 7, 2017, Nurse Skul completed a Mental Impairment Questionnaire, indicating she had been seeing Webb about every month since March 2016.  Tr. 733-734.  Nurse Skul listed diagnoses of major depressive disorder; undifferentiated somatoform; generalized anxiety disorder; and social anxiety disorder.  Tr. 733.  Nurse Skul indicated that Webb was taking Prozac, Lamictal, and Adderall, noting that Prozac and Lamictal caused fatigue.  Tr. 733.  Nurse Skul listed the following clinical findings that demonstrated the severity of Webb's mental impairments and symptoms – uncontrollable shaking, inability to handle social situations, and sleeping up to 16 hours per day.  Tr. 733.  As far as Webb's prognosis, Nurse Skul stated she was not certain but expected Webb to struggle with her issues throughout her lifetime.  Tr. 733.

In the Questionnaire, Nurse Skul was asked to rate Webb's functional abilities in 20 different areas within the four categories of "sustained concentration and persistence," "understanding and memory," "social interaction," and "adaptation."  Tr. 733-734.  In eight areas, Nurse Skul rated Webb as "seriously limited, but not precluded," meaning Webb was limited in her ability to perform the activity 15% of the time.  Tr. 733-734.  Nurse Skul rated Webb as "unable to meet competitive standards" in six areas and as having "no useful ability to function" in six areas.  Tr. 733-734.  Nurse Skul estimated that Webb would be absent from work 4-5 days per month and she would be off-task 80% of the workday.  Tr. 734.

### *Consultative examiner*

On June 1, 2016, Webb saw clinical psychologist, Natalie A. Meyer, PsyD., for a psychological consultative evaluation.  Tr. 532-540.  Dr. Meyer diagnosed generalized anxiety disorder, with panic attacks (per records) and alcohol use disorder, severe, in early remission.  Tr. 539.  Dr. Meyer provided her opinions regarding Webb's functional abilities.  Tr. 539-540.

With respect to Webb's abilities and limitations in understanding, remembering and carrying out instructions, Dr. Meyer indicated that Webb's cognitive abilities were within the borderline to low average range but believed it to be an underestimate of Webb's abilities.  Tr. 539.  Dr. Meyer explained that Webb's verbal abilities were in the average range; she may have difficulties understanding and completing nonverbal tasks; Webb graduated from high school and attended some college; she denied difficulties with understanding information at school or at work in the past; she had no difficulty following conversationally and responding to direct questions; and she is able to care for herself but avoids leaving her room due to anxiety.  Tr. 539.

With respect to Webb's abilities and limitations in maintaining attention and concentration, maintaining persistence and pace, and performing both simple and multi-step tasks, Dr. Meyer explained that Webb had no difficulty following conversations; there was no indication of word retrieval difficulty; she did not request that questions be repeated; she had adequate persistence to task; anxiety appeared to influence her performance on psychometric testing tasks; her working memory abilities were within the borderline range; she had an average ability to remember verbal information but difficulty with visual information; her ability to remember information immediately and after a delay was within the low average range; anxiety influenced her ability to pay attention and concentrate; Webb reported she was easily distracted and had difficulties working at past jobs; anxiety may lead to decreased attention and concentration skills; she may have difficulties remembering multi-step instructions, especially if visual information is involved; and she will do better with verbal information.  Tr. 540.

With respect to Webb's abilities and limitations in responding appropriately to supervision and coworkers in a work setting, Dr. Meyer explained that Webb was cooperative and interacted appropriately with Dr. Meyer; she reported no difficulties getting along with

coworkers and supervisors in the past; Webb indicated that she got along well with people in general; Webb indicated she had been isolating herself to avoid situations that increase her anxiety; she avoided eating, completing chores, or leaving the house if other people will be around; she could be irritable when overwhelmed; and she was nervous during her appointment but was able to maintain her composure and respond appropriately to most tasks.  Tr. 540.

With respect to Webb's abilities and limitations in responding appropriately to work pressures in a work setting, Dr. Meyer explained that Webb was cooperative but did appear anxious, particularly during psychometric testing; she reported difficulties managing anxiety at school and at work in the past; she avoided situations that would increase her anxiety; she had a history of alcoholism and prescription pill abuse; she was in early remission and reported that stress in the past had led to relapses; she had low social support but did attend AA; and work pressure might result in an increase in reported anxiety, discomfort, or other behavior that would impact Webb's ability to cope appropriately.  Tr. 540.

*State agency reviewers*

At the agency level, there was an initial medical review conducted by state agency reviewer Robyn Murry-Hoffman, Ph.D., on March 18, 2016.  Tr. 90-91, 92-94.  In the Psychiatric Review Technique ("PRT") that Dr. Murry-Hoffman completed, she opined that Webb had moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; and one or two repeated episodes of decompensation, each of extended duration.  Tr. 90.  In the Mental RFC Assessment, Dr. Murry-Hoffman opined that Webb had "the ability to remember and understand short and simple instructions[;]" she had poor tolerance for stress and "[a]t this time, she does not have the ability to complete a normal work week [without] interruption from her

17

[psychologically] based symptoms[;]" could "sustain simple routine tasks as long as these involve only occasional and superficial interaction with others. [She] cannot work in situations where they would need to resolve conflicts or maintain a friendly and persuasive demeanor. Tasks can be completed that do not require contact with the public[;]" and she "[c]an work in an environment where duties are fairly static."  Tr. 92-94.  A finding of disabled was initially made. Tr. 97.

Prior to a final determination of disability being made, the Office of Quality Performance (OQP) conducted a further medical review.  Tr. 89, 511-514.  "At issue [was] whether additional psyc. development [was] needed for an adequate decision."  Tr. 89.  Cal VanderPlate, Ph.D., ABPP, conducted the review on April 10, 2016.  Tr. 89, 511-514.  Dr. VanderPlate found that the "[c]urrent [medical evidence of record] [was] rather sketchy with an inadequate picture of current psyc. symptoms and functioning."  Tr. 89.  Dr. VanderPlate concluded that additional psyc. development was needed, indicating in part that the medical evidence of record did "not provide sufficient evidence of symptoms to assess whether [the] diagnosis [of generalized anxiety disorder] [was] supported."  Tr. 89.  On May 4, 2016, the agency concluded that "the medical documentation [was] not sufficient to permit a determination."  Tr. 81.

Thereafter, on June 7, 2016, after the consultative evaluation was performed, a different state agency reviewer, Irma Johnston, Psy.D., completed a PRT and Mental RFC Assessment. Tr. 129-130, 132-134.  In the PRT, Dr. Johnston opined that Webb had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two repeated episodes of decompensation, each of extended duration.  Tr. 129.  In the Mental RFC Assessment, Dr. Johnston opined that Webb had "the ability to remember and understand short and simple

instructions[;]" she had "the ability to maintain sufficient concentration, persistence and pace to perform simple routine work, in settings where there is no demand for a fast pace[;]" she could "sustain simple routine tasks as long as these involve only occasional and superficial interaction with others. [She] cannot work in situations where they would need to resolve conflicts or maintain a friendly and persuasive demeanor[;]" and she "[c]an work in an environment where duties are fairly static, with few changes."  Tr. 132-134.

Upon reconsideration, on August 30, 2016, state agency reviewer Paul Tangeman, Ph.D., completed a PRT and Mental RFC Assessment.  Tr. 169-170, 173-175.  Dr. Tangeman agreed with Dr. Johnston's opinions.  Tr. 169, 173-175.

**C.**     **Hearing testimony and lay evidence**

**1.**     **Plaintiff's testimony**

Webb testified and was represented at the hearing.  Tr.  48-69.  Webb explained that she shakes a lot which causes her other problems.  Tr. 54, 65.  For example, she drops things a lot, she has problems buttoning, and putting on jewelry.  Tr. 54.  Her handwriting is not legible.  Tr. 53-54.  There have been times when Webb is shaking so much that her doctors have not been able to take her blood pressure.  Tr. 66.  Webb has problems walking – she trips a lot.  Tr. 54.  Once she falls, her whole body becomes weak and she has to be picked up.  Tr. 54-55.  She is not able to pull herself up.  Tr. 55.  If Webb is home alone, she will go down the stairs on her buttocks because of her concerns about falling.  Tr. 55.

Webb explained that she has a very difficult time leaving her house.  Tr. 54.  She gets physically ill if she has to leave the house for more than 15-20 minutes.  Tr. 54, 58-59.  One time, Webb was at her doctor's office and started having a panic attack and had to stay at her doctor's office because she was unable to drive.  Tr. 54.  Webb broke her hand once and the

doctors wanted to have her go to therapy but Webb attended only one session because she could not keep leaving the house.  Tr. 66-67.  She just wanted to do exercises at home.  Tr. 67.

During the day, Webb typically wakes up, lets her dogs out into the yard, watches television, and is on her iPad.  Tr. 55.  Webb no longer walks her two dogs because her balance is off.  Tr. 56-57.  Her fiancé walks them.  Tr. 56.  Webb likes to watch movies.  Tr. 57.  She usually has to rewind the movie a few times to follow along.  Tr. 57.  Webb is forgetful when she is talking to people – she will forget what she was saying mid-sentence or just draw a blank.  Tr. 57.  Webb looks at YouTube or Facebook on her iPad.  Tr. 57.  She posts pictures on Facebook.  Tr. 57-58.  Webb tries to pick up around the house and she helps her daughter with her hair in the morning and makes her a sandwich for her lunch but Webb she mostly just sits at home.  Tr. 55, 63.  Webb's fiancé performs most of the household chores.  Tr. 62-63.

Webb is most comfortable being at home.  Tr. 55-56.  Her home is her safety zone.  Tr. 69.  She does not go out places with her children because she does not want to put herself into the position of being out somewhere and having a panic attack.  Tr. 58.  When Webb has a panic attack, she feels like she has been hit by a train and it takes her the next day to fully recover.  Tr. 59.  Webb's fiancé drives her to her medical appointments.  Tr. 60.  She has to force herself to go.  Tr. 60.  Her medical providers know how hard it is for her to be out so they get her in and out.  Tr. 60.  She described herself as being a mess – she sweats and shakes.  Tr. 60.  When Webb has an upcoming appointment, she dreads it for a week because she knows she is going to have to leave.  Tr. 60.  Webb relayed that being at the hearing made her feel like she was going to cry; everything in her body was stiffening up; and she felt that she wanted to curl up into a ball.  Tr. 64.

Webb's doctors have provided her with some exercises and medication to help her with her balance and symptoms. Tr. 59. Webb rated the treatment as somewhere between helpful and not helpful but she indicated that there was not much else that her doctors could do for her. Tr. 59. Webb occasionally – about once a month – uses marijuana that a family member will bring to her. Tr. 60-62. Webb indicated that the marijuana helps her with her nausea. Tr. 61. Webb's family lives about 45 minutes from her. Tr. 62. They come over occasionally to visit and they will order a pizza in because Webb cannot go to restaurants. Tr. 62. For the recent Thanksgiving holiday, Webb stayed home. Tr. 62. Her fiancé's mother made dinner and Webb's fiancé brought some dinner home to Webb. Tr. 62.

### 2. Vocational expert's testimony

Vocational Expert Mark Anderson ("VE") testified at the hearing. Tr. 69-77. The VE described Webb's past work as (1) a sign installer, a heavy, semi-skilled (SVP 3)[4] position, performed at the heavy level; and (2) a companion, a light, semi-skilled (SVP 3) position, performed at the sedentary level. Tr. 70-71.

For his first hypothetical, the ALJ asked the VE to assume an individual Webb's age and with her education and past work experience who is limited to light work except the individual can never be exposed to unprotected heights, moving mechanical parts, and can never operate a motor vehicle; she is limited to performing simple, routine, and repetitive tasks not at a production rate pace, i.e., assembly line work; she is limited to simple work-related decisions in using her judgment and dealing with changes in the work setting; and she is limited to occasional

---

[4] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000). "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." *Id.*

interaction with supervisors, coworkers, and the public.  Tr. 71-72.  The VE indicated that Webb's past work would not be available.  Tr. 72.  There would be other work available, including mail clerk, assembler of printed products, and inspector and hand packager.  Tr. 72.

For his second hypothetical, the ALJ asked the VE to assume that the individual is limited to light work except the individual is limited to frequent handling and fingering with the left and right hands; occasional climbing of ramps and stairs; never able to climb ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, or crawling; she can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; she is limited to simple, routine, or repetitive tasks but not at a production rate pace, i.e., assembly line work; she is limited to simple work-related decisions in using her judgment and dealing with changes in the work setting; and she is limited to occasional interaction with supervisors, coworkers, and the public  Tr 73.  The VE indicated that the described individual would be unable to perform Webb's past work.  Tr. 73.  The inspector and hand packager and mail clerk job would remain available and an electronics worker job would also be available.  Tr. 74.

For his third hypothetical, the ALJ asked the VE to assume the individual described in the second hypothetical but with the exertional level modified to sedentary.  Tr. 74.  The VE indicated that there would be jobs available to the described individual, including patcher (which involves putting electrical components together), ampoule sealer, and touch-up screener (which involves inspecting electronic assemblies).  Tr. 74-75.

For his fourth hypothetical, the ALJ modified the first through third hypotheticals to include a limitation of never interacting with the public.  Tr. 75.  The VE indicated that that modification did not change his responses to the first three hypothetical questions.  Tr. 75.

For his fifth hypothetical, the ALJ asked the VE to assume the same limitations as described in the fourth hypothetical but to add that the individual could never interact with coworkers. Tr. 75. The VE indicated that that additional limitation would require the individual to work alone and there were no unskilled jobs that allow someone to work alone. Tr. 75.

For his sixth hypothetical, the ALJ asked the VE to add to the first four hypotheticals that, in addition to normal breaks, the individual would be off task 20% of an eight-hour workday and/or absent from work two days per month. Tr. 75. The VE indicated that the off-task limitation would eliminate all unskilled work. Tr. 76. The VE explained that generally an employee can be off task up to 15% of the workday so 20% would be work preclusive. Tr. 76. Also, being absent beyond two days per month would be work preclusive. Tr. 76.

Webb's counsel asked the VE to consider the ALJ's first four hypotheticals but to add that the individual has to perform the work at home. Tr. 76. The VE indicated that he was not familiar with any unskilled work that could be performed from home. Tr. 76. Also, Webb's counsel asked the VE to consider the ALJ's first four hypotheticals but to add that the individual does not have the ability to complete a normal week without interruptions from psychologically-based symptoms. Tr. 76. The VE indicated that, if that was occurring on a weekly basis and if it would cause the individual to be absent, tardy or leave early, then the individual would not be employable. Tr. 77.

### 3. Jason Springman

On November 7, 2017, Webb's fiancé completed a Function Report. Tr. 354-361. Mr. Springman indicated that if Webb leaves their house she will become physically ill; she cannot go to the store; and she no longer drives because of panic attacks. Tr. 354, 357. He indicated

that Webb has problems with her balance.  Tr. 359.  Mr. Springman indicated that Webb does not handle stress well and she stays at home because that is where she feels safe.  Tr. 361.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[5]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107

S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

## IV. The ALJ's Decision

In his April 9, 2018, decision, the ALJ made the following findings:[6]

1.      Webb meets the insured status requirements of the Social Security Act through June 30, 2019.  Tr. 19.

2.      Webb has not engaged in substantial gainful activity since February 28, 2015, the alleged onset date.  Tr. 19.

3.      Webb has the following severe impairments: somatoform disorder, conversion disorder, depression and anxiety.  Tr. 19-20.  Webb has the following non-severe impairments: cirrhosis with no evidence of resulting functional limitations; cardiomegaly with no evidence of resulting functional limitations; and alcohol, substance addiction "in remission" with no evidence of ongoing functional limitations in any area.  Tr. 20.

4.      Webb does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 20-21.

---

[5] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[6] The ALJ's findings are summarized.

5.      Webb has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except she is limited to frequent handling and fingering with the left and right; occasional climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; limited to performing simple, routine, and repetitive tasks but not at a production rate pace (i.e., assembly line work); limited to simple work-related decisions in using her judgment and dealing with changes in the work setting; limited to occasional interaction with supervisors and coworkers and she can never interact with the public. Tr. 21-28.

6.      Webb is unable to perform any past relevant work. Tr. 29.

7.      Webb was born in 1982 and was 33 years old, defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 29.

8.      Webb has at least a high school education and is able to communicate in English. Tr. 29.

9.      Transferability of job skills is not material to the determination of disability. Tr. 29.

10.     Considering Webb's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Webb can perform, including mail clerk, electronics worker, and inspector/hand packager. Tr. 33-34.

Based on the foregoing, the ALJ determined that Webb had not been under a disability, as defined in the Social Security Act, from February 28, 2015, through the date of the decision. Tr. 30.

## V. Plaintiff's Arguments

Webb argues: (1) the ALJ failed to properly consider and weigh medical opinion evidence; (2) the ALJ did not properly evaluate Webb's psychological impairments at Step Three; and (3) the ALJ did not meet his burden at Step Five based on the hypothetical questions asked to the VE. Doc. 14, pp. 15-24, Doc. 18.

## VI. Law & Analysis

**A.      Standard of review**

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial

evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir.

2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a

reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence

also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,

477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's

decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc.

Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.      The Court should find that the ALJ did not err with respect to his consideration, or
weighing, of the medical opinion evidence**

Webb contends that the ALJ erred when weighing the medical opinions offered by treating sources (Dr. Craft, Dr. Kelly, and Nurse Skul); examining psychologist (Dr. Meyer); and reviewing psychologists (Dr. Murry-Hoffman, Dr. Johnston, and Dr. Tangeman).  Doc. 14, pp. 15-20, Doc. 18, pp. 1-3.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).  However, the "good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers

the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).

Where there is no ongoing treatment relationship, an opinion is not entitled to deference or controlling weight under the treating physician rule. *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).

The Regulations explain that not all medical sources are "acceptable medical sources." *See* 20 C.F.R. § 404.1513.[7]  For example, nurse practitioners and therapists are medical sources but they are not considered "acceptable medical sources."  20 C.F.R. § 404.1513(d).  The opinion of a medical source who has seen a claimant in her professional capacity but who is not an "acceptable medical source" is relevant evidence.  SSR 06-03p, 2006 WL 2329939, * 6 (August 9, 2006).   SSR 06-03p provides guidance as to how opinions of medical sources who are not "acceptable medical sources" are to be considered, stating,

> Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions.
>
> Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

SSR 06-03p, 2006 WL 2329939, * 5.

---

[7] Since Webb's claim was filed prior to March 26, 2017, the version of 20 C.F.R. § 404.1513 effective from September 3, 2013, to March 26, 2017, is the applicable version of the Regulation.

The undersigned initially notes that many of Webb's arguments regarding the ALJ's consideration and weighing of the medical opinion evidence are vague and undeveloped.  Thus, some of Webb's argument may be deemed waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).  However, in the interest of completeness and in the event her arguments are not deemed waived, the undersigned has considered Webb's arguments below.

### 1.  Treating providers

*Dr. Craft*

In her opening brief, in a rather undeveloped argument, Webb appears to challenge the ALJ's reason for discounting Dr. Craft's February 17, 2016, opinion.  Doc. 14, p. 15.  She simply states that, "the ALJ gave limited weight to Dr. Craft as 'he did not provide function-by-function statements, which renders his input less useful.'"  Doc. 14, p. 15 (citing Tr. 23).  Webb fails to show that the ALJ's stated reason for discounting Dr. Craft's February 17, 2016, opinion is unsupported by the record.  A review of the February 17, 2016, opinion demonstrates that the ALJ correctly observed that there were no function-by-function statements contained therein.  Tr. 487-488.  Moreover, as observed by the ALJ, Dr. Craft indicated he was not aware of any personal or physical limitations and Dr. Craft believed that Webb would benefit from social interaction at work and it would lessen her chance of being at home to feel lonely and put her at risk to relapse.  Tr. 23, 488.

In her reply brief, pointing to the ALJ's weighing of the recommendation made by Dr. Craft when he saw Webb in June 2016, Webb contends that the decision would have changed if

the ALJ had adopted Dr. Craft's opinion.  Doc. 18, pp. 2-3.  During a June 27, 2016, office visit, Dr. Craft indicated that, if the behavior Webb exhibited in his office that day was her normal, he would not recommend her working as she should be placed in an intense inpatient or outpatient program.  Tr. 549.  The ALJ considered the recommendation and assigned it little weight, explaining "I give little weight to Dr. Craft's recommendation of not working in light of the fact that the claimant was not placed in an 'intense' inpatient or outpatient treatment program at any time."  Tr. 25.  Webb contends that "[t]his finding was not a legally defensible reason for discounting the opinion of the treating physician."  Doc. 18, p. 3.  Dr. Craft's recommendation that Webb should not work was tied to his opinion that, _if_ her behavior on that day was her normal, Webb should be placed in an intense inpatient or outpatient program.  Tr. 549.  There was however no finding that the behavior that day was Webb's normal.  Tr. 549.  In fact, Dr. Craft's February 17, 2016, opinion was quite different.  Tr. 488.  And, as indicated by the ALJ, Webb was not placed in an intense inpatient or outpatient treatment program.  Tr. 25.  Thus, the ALJ found Dr. Craft's opinion to be entitled to little weight.  Tr. 25.  Given the foregoing, even if Webb's argument, which appears to have been raised only in her reply brief, is considered, the undersigned finds Webb has not shown that the ALJ's reason for discounting Dr. Craft's recommendation of no work is unsupported by the record or not a valid reason.

### _Dr. Kelly_[8]

Webb takes issue with the ALJ's weighing of Dr. Kelly's opinion because the ALJ assigned it only "little weight" on the basis that Dr. Kelly had only seen Webb once when the form was completed but gave "some weight" to the opinion of the consultative examiner who

---

[8] The Commissioner contends that Brittany Kelly, Ph.D., is not an acceptable medical source because there is no indication that she is a licensed psychologist.  Doc. 17, p. 13.  Whether or not Dr. Kelly is considered an acceptable medical source, the undersigned's recommendation would not change.

saw Webb only once.  Doc. 14, p. 15.  Webb does not contend that Dr. Kelly saw her more than once at the time Dr. Kelly rendered her opinion.  Moreover, the ALJ did not discount Dr. Kelly's opinion solely on that basis.  The ALJ also discounted Dr. Kelly's opinion because he found that it was not consistent with her examination findings and because she did not have the benefit of reviewing collateral information.  Tr. 23.  Dr. Kelly's examination findings in January 2016 reflected that Webb was fidgety, cooperative and friendly; her speech was coherent and her tone was adequate; her mood and affect were anxious; her memory was good; her intelligence was above average; and her insight and judgment were fair.  Tr. 23, 482.  Dr. Kelly diagnosed generalized anxiety disorder and recommended counseling.  Tr. 23, 483-484.  Dr. Kelly had not reviewed other information, i.e., Wechsler test results, daily activities questionnaire, medical records, etc., unlike the consultative examiner (Tr. 532-533).  Considering the foregoing, the undersigned finds no error with respect to the ALJ's weighing of Dr. Kelly's opinion.

### *Nurse Skul*

Although Nurse Skul is not an acceptable medical source, the ALJ discussed and weighed her opinion.  Tr. 27.  Nurse Skul opined that Webb was extremely limited.  Tr.  733-734.  In eight areas, Nurse Skul rated Webb as "seriously limited, but not precluded."  Tr. 733-734.  Nurse Skul rated Webb as "unable to meet competitive standards" in six areas and as having "no useful ability to function" in six areas.  Tr. 733-734.  Nurse Skul also estimated that Webb would be absent from work 4-5 days per month and she would be off-task 80% of the workday.  Tr. 734.  The ALJ stated, "I give little weight to Nurse Skul's input because such extreme limitations are at odds with the treatment notes and the limited, conservative course of treatment."  Tr. 27.

Webb has not shown that the ALJ's finding that Nurse Skul's limitations were extreme is not supported by the record.  Further, she has not shown that the ALJ's reasons for discounting Nurse Skul's opinion are not supported by the record.  She argues that the ALJ "made the ludicrous assertion that unless the Plaintiff was hospitalized for her psychiatric impairments, she must be capable of leaving her house and engaging in substantial gainful activity."  Doc. 14, p. 19.  The ALJ did not conclude that Webb was not disabled solely because she was not hospitalized for her psychiatric impairments.  The ALJ cited the lack of psychiatric hospitalizations as one of many reasons why he concluded that the evidence was not consistent with the alleged disabling impairments.  Tr. 27.  Further the lack of psychiatric hospitalizations supports the ALJ's finding that Nurse Skul's extreme limitations were not consistent with Webb's conservative course of treatment.  Tr. 27.

Considering the foregoing, Webb's claim that the ALJ's reasons for assigning little weight to Nurse Skul's opinion are not valid is unfounded.

### 2.  Examining psychologist

Webb's argument with respect to the ALJ's weighing of the opinion rendered by consultative examining psychologist Dr. Meyer is not entirely clear.  Doc. 14, pp. 15-16.  Her argument as it pertains to Dr. Meyer is presented alongside her argument regarding Dr. Kelly's opinion.  Doc. 14, pp. 15-16.  Webb argues that, although both Dr. Kelly and Dr. Meyer only examined Webb once, the two opinions "were given different treatment by the same ALJ in the same case."  Doc. 14, pp. 15-16.  Webb proceeds to argue that "[t]his discrepancy poisoned the decision of the ALJ and should result in this matter being remanded."  Doc. 14, p. 16.  Also, in her reply brief, Webb asserts that, even though the state agency assigned great weight to Dr.

Meyer's opinion, the ALJ assigned the opinion only some weight because Webb was not treating with medication.  Doc. 18, p. 2.

Dr. Meyer was not a treating source whose opinion was entitled to deference under the treating physician rule.  Nevertheless, the ALJ explained the weight he assigned to Dr. Meyer's consultative opinion.  After detailing Dr. Meyer's opinion (Tr. 24-25), the ALJ stated:

> I give some weight to Dr. Meyer's opinion because she had the benefit of examining the claimant and because of her area of specialty.  However, I give limited weight to her opinion because the claimant had not been taking her psychotropic medications including her medication for anxiety at or near the time of the examination.

Tr. 25.

As discussed above, the ALJ assigned little weight to the opinion of Dr. Kelly because Dr. Kelly had only seen Webb once before Dr. Kelly completed the forms and because Dr. Kelly's opinion was not consistent with her findings on examination.  Tr. 23.  Thus, the ALJ did not discount Dr. Kelly's opinion solely because she had only examined Webb once at the time her opinion was rendered.  Further, Webb has not shown that the ALJ erred by not assigning the same weight to the opinions rendered by Dr. Kelly and Dr. Meyer even though they had both seen Webb only once at the time they rendered their opinions was error.  The ALJ considered each opinion and provided reasons for the weight assigned.   And Webb has not shown that the reasons provided by the ALJ for the weight assigned are not supported by substantial evidence.

Also, Webb has not shown that the ALJ's decision to assign limited weight to Dr. Meyer's opinion was error in light of the state agency's decision to give great weight to Dr. Meyer's opinion.  Webb has not shown that the ALJ was required to assign the same weight to Dr. Meyer's opinion as the state agency.  Nor has Webb shown that the ALJ's reasons for discounting Dr. Meyer's opinion were not supported by substantial evidence.

For the above reasons, Webb has not shown error with respect to the ALJ's weighing of Dr. Meyer's opinion.

### 3. Reviewing psychologists

Webb argues that the ALJ erred with respect to his review of the state agency reviewing psychologists' opinions because the ALJ weighed the opinions rendered by state agency reviewing psychologists Drs. Johnston and Tangeman but did not mention the assessment completed by state agency reviewing psychologist Dr. Murry-Hoffman. Doc. 14, p. 16. As discussed above, following Dr. Murry-Hoffman's assessment, the OQP conducted a further medical review. Tr. 89, 511-514. "At issue [was] whether additional psyc. development [was] needed for an adequate decision." Tr. 89. Cal VanderPlate, Ph.D., ABPP, conducted the review on April 10, 2016. Tr. 89, 511-514. Dr. VanderPlate found that the "[c]urrent [medical evidence of record] [was] rather sketchy with an inadequate picture of current psyc. symptoms and functioning." Tr. 89. Dr. VanderPlate concluded that additional psyc. development was needed, indicating in part that the medical evidence of record did "not provide sufficient evidence of symptoms to assess whether [the] diagnosis [of generalized anxiety disorder] [was] supported." Tr. 89. On May 4, 2016, the state agency concluded that "the medical documentation [was] not sufficient to permit a determination." Tr. 81. Thereafter, on June 7, 2016, after the consultative evaluation was performed, a different state agency reviewer, Dr. Johnston, completed a PRT and Mental RFC Assessment. Tr. 129-130, 132-134. Upon reconsideration, on August 30, 2016, state agency reviewer Dr. Tangeman completed a PRT and Mental RFC Assessment. Tr. 169-170, 173-175.

The ALJ weighed the assessments provided by Drs. Johnston and Tangeman. Tr. 28. The ALJ assigned considerable weight to their opinions but added a further limitation of no

interaction with the public. Tr. 28. Webb takes issue with the ALJ's failure to mention Dr. Murry-Hoffman's earlier assessment. However, as indicated, Dr. Murry-Hoffman's assessment was based on insufficient evidence and the ALJ considered and weighed the assessments that were completed following further development of the evidence. Tr. 28. Additionally, a similar argument was made and rejected by *Heintzelman v. Berryhill*, 2017 U.S. Dist. LEXIS 150869, * 16-18 (E.D. MO. Sept. 18, 2017). In that case, the district court concluded that, although the ALJ did not mention an assessment completed prior to an OQP review, the failure to do so did not indicate the ALJ did not consider it or the issues addressed by the physician prior to the OQP review. *Id.* at * 18. Here, as in *Heinzelman*, while the ALJ did not mention Dr. Murry-Hoffman's assessment, Webb has not shown that the ALJ did not consider Dr. Murry-Hoffman's assessment. For example, Exhibits 3A and 4A, which the ALJ referenced when discussing the state agency reviews, contain a discussion of the prior proposed allowance and the need for additional psychological development. Tr. 28, 128, 149. Furthermore, Webb has not shown that the ALJ failed to consider the evidence considered by Dr. Murry-Hoffman, e.g., evidence regarding Webb's poor tolerance for stress. *See e.g.*, Tr. 23 (discussing January 2016 mental health services' records reflecting issues with managing stress and March 5, 2016, opinion from Dr. Kelly).

For the reasons discussed herein, Webb has not shown that reversal and remand is required for consideration of the assessment completed by Dr. Murry-Hoffman prior to the OQP review.

## C. The Court should find no error at Step Three

Webb contends that the ALJ erred at Step Three when assessing whether Webb's impairments satisfied the criteria under Listings 12.04 (Depressive, bipolar and related

disorders), 12.06 (Anxiety and obsessive-compulsive disorders), and 12.07 (Somatic symptom and related disorders).  Doc. 14, pp. 20-22.  Webb contends that, instead of analyzing the "A" criteria of these listings, the ALJ only indicated he considered the state agency reviewing opinions.  Doc. 14, p. 20.

At Step Three of the disability evaluation process, a claimant will be found disabled if her impairment(s) meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that her condition meets or equals a Listing.  *Thacker v. SSA*, 93 Fed. Appx. 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker* 93 Fed. Appx. at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).  "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'"  *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011).  "A claimant must satisfy all the criteria to 'meet' the listing."  *Id.*  There is no heightened articulation standard at Step Three.  *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir. Jan. 31, 2006) (unpublished).

To satisfy Listings 12.04 and 12.06, a claimant must demonstrate the "A" and "B" criteria or the "A" and "C" criteria.  20 C.F.R. § Pt. 404, Subpt. P, Appx. 1, Pt. A2, Listings 12.04 and 12.06.  To satisfy Listing 12.07, a claimant must demonstrate the "A" and "B" criteria.  20 C.F.R. § Pt. 404, Subpt. P, Appx. 1, Pt. A2, Listing 12.07.

In addressing whether Webb's impairments satisfied a listing, the ALJ considered and discussed the "B" criteria as well as the "C" criteria and concluded that Webb's impairments did

not satisfy either the "B" criteria or the "C" criteria.  Tr. 20-21.  Since a claimant must satisfy the "B" and/or "C" criteria in addition to the "A" criteria to satisfy Listing 12.04, 12.06 or 12.07, the ALJ's failure to specifically discuss the "A" criteria does not require reversal and remand.

Furthermore, Webb has not shown that the ALJ's evaluation of the "B" or "C" criteria is not supported by substantial evidence.  To satisfy the "B" criteria, a claimant's mental impairment must result in at least one extreme or two marked limitations in the areas of: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintain pace; or (4) adapting or managing themselves.  20 C.F.R. § Pt. 404, Subpt. P, Appx. 1, Pt. A2; Tr. 20.  The ALJ evaluated each of these broad areas of functioning and concluded that Webb had moderate limitations in each of the areas.  Tr. 20-21. Thus, the ALJ found that the "B" criteria were not satisfied.  Webb contends that the medical opinions and other evidence of record support a finding of marked limitations in more than one area.  However, as discussed more fully above, the ALJ did not err with respect to his evaluation of the medical opinion evidence and, in evaluating Webb's claim, the ALJ considered other evidence which Webb points to in support of her claim that her impairments satisfy the "B" criteria, e.g., problems with concentration, self-isolation, and shaking.  Tr. 20-21, 22-28.

Furthermore, even if the evidence which Webb points to supports her position, the Court cannot overturn the Commissioner's decision where "substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  The ALJ did not find that Webb was without limitation.  While Webb disagrees with the ALJ's evaluation of the "B" criteria, she has not demonstrated that the ALJ's findings of moderate limitations are not supported by substantial evidence.  Her argument is an attempt to have this Court consider her claim anew.  However, it is not for this Court to "try the case *de*

*novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.

Webb also challenges the ALJ's finding relative to the "C" criteria.  The ALJ concluded that Webb had "not had a 'serious and persistent' mental disorder over a period of at least two years with only 'marginal' adjustment despite treatment, therapy, support, or a highly structured setting."  Tr. 21.  Webb challenges this finding, arguing that she "had more than two years of treatment for anxiety and PTSD along with an inability to leave the safety of her home."  Doc. 14, p. 22.  In response, the Defendant asserts that Webb fails to identify the evidence that supports her claim that she had more than two years of treatment for anxiety and PTSD for more than two years.  Doc. 17, p. 24.  In her reply, Webb does not respond to Defendant's argument. Considering that the burden is on Webb at Step Three, her failure to identify evidence to support her claim that the ALJ erred with respect to the "C" criteria should be rejected.

For the reasons discussed herein, Webb has not shown that the ALJ erred at Step Three or that his Step Three finding is unsupported by substantial evidence.

**D.  The Court should find no error at Step Five**

In her final argument, Webb reframes her prior arguments as a Step Five argument.  She argues that that ALJ did not meet his burden at Step Five because he did not consider Dr. Murry-Hoffman's assessment that Webb would have a marked limitation in her ability to complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, which led the state agency to reach an initial finding of disability.  Doc. 14, pp. 23-24.  Webb also points out that the VE indicated that there would be no jobs available to an individual who was

39

limited to unskilled work if she had to work from home and there were no questions posed to the VE relating to Webb's documented shaking. Doc. 14, p. 24, Doc. 18, p. 3.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

As discussed above, Webb has not shown error with respect to the ALJ's weighing of the medical opinion evidence or that the ALJ ignored evidence. Nor has she shown that the RFC is unsupported by substantial evidence. Since the VE hypothetical upon which the ALJ relied incorporated those limitations that the ALJ accepted as credible, the VE's testimony serves as substantial evidence in support of the ALJ's Step Five finding. Accordingly, reversal and remand is not warranted.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.


October 21, 2019                              */s/ Kathleen B. Burke*
                                             Kathleen B. Burke
                                             United States Magistrate Judge



## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).